Todd A. Green (Bar No. 174485)
tgreen@GreenLLP.com
GREEN LLP
Cannery Village
419 31st Street, Suite A
Newport Beach, California 92663
Telephone: 949.288.6565
Facsimile: 949.288.6565

Attorneys for Plaintiffs Carl Lennart Golbranson,
Carol Golbranson and Robert Seidler

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL LENNART GOLBRANSON, an individual; CAROL GOLBRANSON, an individual, in her capacity as trustee of the Carol Golbranson Revocable Trust Dtd 10/19/98; ROBERT SEIDLER, an individual, in his capacity as trustee of the Robert Seidler Revocable Trust dated October 21, 1999,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>COMPUTER FORENSIC SERVICES, LLC, a Delaware limited liability company,<br><br>　　　　Defendant. | Case No. _____<br><br>**COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT** |

Plaintiffs Carl Lennart Golbranson, Carol Golbranson and Robert Seidler allege as follows:

## JURISDICTION

1. This Court has original jurisdiction over this action pursuant to 28 USC section 1332 because this is a civil action between citizens of different states in which the amount in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

## THE PARTIES

2. Plaintiff Carl Lennart Golbranson is, and at all times relevant was, a citizen of California residing in Los Angeles County, California.

3. Plaintiff Carol Golbranson is, and at all times relevant was, a citizen of California residing in Los Angeles County, California. Carol Golbranson brings this action in her capacity as trustee of the Carol Golbranson Revocable Trust Dtd 10/19/98.

4. Plaintiff Robert Seidler is, and at all times relevant was, a citizen of California residing in Los Angeles County, California. Robert Seidler brings this action in his capacity as trustee of the Robert Seidler Revocable Trust dated October 21, 1999.

5. Defendant Computer Forensic Services, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in the State of Minnesota.

## FACTUAL BACKGROUND

### The Agreement

6. All plaintiffs and the defendant are parties to that certain Amended and Restated Limited Liability Company Agreement dated May 4, 2017 (the "Agreement").

7. A true and correct copy of the Agreement is attached hereto as Exhibit A.

### Major Default Events -- Defined

8. The Agreement provides that certain occurrences constitute a "Major Default Event" and that, upon the occurrence of a Major Default Event, the Plaintiffs have certain rights and the Company has certain obligations.

2
**COMPLAINT**

9. Specifically, the Agreement defines the term "Major Default Event" to include a breach by the Company of its obligations to honor any of the rights granted to the Plaintiffs in the Agreement. (Ex. A, p. 33.)

10. The rights granted to the Plaintiffs in the Agreement include that the Company will not enter into or amend any agreement or arrangement with a "Related Person" (as defined in the Agreement) of the Company without first obtaining the approval, by vote or written consent, of plaintiff Carl Lennart Golbranson. (Ex. A, p. 13, sec. 4.3.2(b).)

11. The rights granted to the Plaintiffs in the Agreement also include that the Company will not enter into new, or amend any existing employment agreements or arrangements with any senior Company officer, or increase the compensation of any Company officer above his/her compensation in effect on the effective date of the Agreement without first obtaining the approval, by vote or written consent, of plaintiff Carl Lennart Golbranson. (Ex. A, p. 14, sec. 4.3.2(k).).

12. The rights granted to the Plaintiffs in the Agreement also include that the Company will permit Plaintiffs' representatives to visit and inspect any Company properties, examine its business, financial and operating records and make copies of those records. (Ex. A, p. 21, sec. 10.2.1.)

13. The rights granted to the Plaintiffs in the Agreement also include that the Company will use reasonable best efforts to deliver to Carol Golbranson and Robert Seidler, in their capacities as trustees of their respective trusts: (i) "Financial Information" (as defined in the Agreement) within 30 days after the end of each month and 60 days after the end of each fiscal year, (ii) the Annual Budget (as defined in the Agreement) for the succeeding year on or before December 1 of each fiscal year, and (iii) revisions to the Annual Budget promptly after adoption. (Ex. A, p. 21, sec. 10.2.2.)

**Plaintiffs' Rights and The Company's Obligations Upon the Occurrence of a Major Default Event**

14. The Agreement provides that, upon the occurrence of a Major Default Event, the Plaintiffs may, by delivering a "Liquidity Notice" to the Company, require the Company to redeem their investment in the Company. (Ex. A, p. 20, sec. 10.1.)

**Occurrence of Major Default Events**

15. The Company has breached the Agreement and caused Major Default Events to occur by entering into or amending agreements or arrangements with "Related Persons" of the Company without first obtaining the approval, by vote or written consent, of plaintiff Carl Lennart Golbranson in violation of section 4.3.2(b).

16. The Company has also breached the Agreement and caused Major Default Events to occur by entering into new, or amending existing, employment agreements or arrangements with a senior Company officer, or increasing the compensation of a Company officer without first obtaining the approval, by vote or written consent, of plaintiff Carl Lennart Golbranson in violation of section 4.3.2(k).

17. The Company has also breached the Agreement and caused Major Default Events to occur by failing to deliver to Carol Golbranson and Robert Seidler, in their capacities as trustees of their respective trusts: (i) Financial Information within 30 days after the end of each month and 60 days after the end of each fiscal year, (ii) the annual budget for the succeeding year on or before December 1 of each fiscal year, and (iii) revisions to the Annual Budget promptly after adoption – all in violation of section 10.2.2

18. The Company has also breached the Agreement and caused Major Default Events to occur by failing to permit the trust Plaintiffs' representatives to examine the Company's business, financial and operating records and "make copies of those records for any purpose reasonably related to the Trust's interest in the Company" as required by Section 10.2.1 of the Agreement.

19. The Company has also breached the Agreement and caused Major Default Events to occur by failing to keep or cause to be kept complete and accurate financial books, records and accounts as required by Section 10.2 of the Agreement.

**Plaintiffs Exercise their Liquidity Right, and the Company Refuses To Honor It**

20. Because of the Major Default Events described above, on October 18, 2019, Plaintiffs sought to initiate the process to redeem their membership interests in the Company by delivering a "Liquidity Notice" to the Company pursuant to section 10.1.1 of the Agreement. A true and correct copy of Plaintiffs' notice of Major Default Events and Liquidity Notice is attached hereto as Exhibit B.

21. The Company has failed and refused to redeem Plaintiffs' investments in the Company or to engage in the process set forth in the Agreement to determine the redemption price.

## FIRST CAUSE OF ACTION

### Breach of Contract

22. Plaintiffs reallege and incorporate by reference paragraphs 1 through 21 of this Complaint as if fully set forth herein.

23. Plaintiffs and the Company are parties to a contract – the Agreement.

24. Plaintiffs have performed all obligations required to be performed by them under the Agreement except any obligations they have been excused or prevented from performing

25. As set forth in the Factual Background, above, the Company has breached the Agreement and committed Major Default Events by, *inter alia,*

(i) entering into or amending agreements or arrangements with a "Related Person" of the Company without first obtaining the approval, by vote or written consent, of Plaintiff Carl Lennart Golbranson;

(ii) changing the terms of its agreements or arrangements with a senior Company officer, or increasing the compensation of a Company officer without first obtaining the approval, by vote or written consent, of plaintiff Carl Lennart Golbranson;

(iii) failing to use reasonable best efforts to deliver to Carol Golbranson and Robert Seidler, in their capacities as trustees of their respective trusts: (a) Financial Information within 30 days after the end of each month and 60 days after the end of each fiscal year, (b) the Annual Budget for the succeeding year on or before December 1 of each fiscal year, and (c) revisions to the Annual Budget promptly after adoption;

(iv) failing and refusing to permit Plaintiffs' representatives to examine the Company's business, financial and operating records and make copies of those records for any purpose reasonably related to the Trust's interest in the Company as required by Section 10.2.1 of the Agreement;

(v) failing to keep complete and accurate financial books, records and accounts; and

(vi) failing and refusing to redeem Plaintiffs' investments in the Company or to engage in the process set forth in the Agreement to determine the redemption price.

26. Plaintiffs have been damaged by the aforementioned breaches of contract and Major Default Events in an amount to be determined at trial but, in any case, no less than Two Million Dollars.

### **PRAYER FOR RELIEF**

FOR THE FOREGOING REASONS, Plaintiffs seek judgment awarding them the following relief:

a)  Compensatory damages according to proof but, in any event, no less than Two Million Dollars;

b)  Attorneys' fees incurred in this action;

c)  Costs and expenses incurred in this action; and

d)  Such other and further relief as this Court deems just and proper.

Dated:  November  6  , 2019        **GREEN LLP**

By:    s/Todd A. Green
        Todd A. Green
        Attorneys for Plaintiffs Carl Lennart Golbranson,
        Carol Golbranson and Robert Seidler

**COMPLAINT**

# EXHIBIT A

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## OF

## COMPUTER FORENSIC SERVICES, LLC

THE OFFER AND SALE OF THE MEMBERSHIP INTERESTS REFERENCED IN THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR REGISTERED OR QUALIFIED UNDER THE SECURITIES LAWS OF ANY STATE. THOSE MEMBERSHIP INTERESTS MAY NOT BE OFFERED, SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED AND/OR QUALIFIED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR WITHOUT AN EXEMPTION FROM SUCH REGISTRATION AND/OR QUALIFICATION. THERE IS NO TRADING MARKET FOR THE MEMBERSHIP INTERESTS, AND ONE IS UNLIKELY TO DEVELOP. THIS AGREEMENT IMPOSES SUBSTANTIAL RESTRICTIONS ON THE TRANSFERABILITY AND VOTING RIGHTS OF THE MEMBERSHIP INTERESTS. NO SALE, TRANSFER OR OTHER DISPOSITION OF SUCH INTERESTS MAY BE MADE EXCEPT IN ACCORDANCE WITH THIS AGREEMENT. THEREFORE, MEMBERS MAY NOT BE ABLE TO READILY LIQUIDATE THEIR INVESTMENTS.

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Agreement is entered into as of May 4, 2017 (the "**Effective Date**"), by Computer Forensic Services, Inc., a Minnesota corporation ("**CFS**"), Carl Lennart Golbranson, an individual ("**CLG**"), the Carol Golbranson Revocable Trust Dtd 10/19/98 (the "**CG Trust**"), and the Robert Seidler Revocable Trust dated October 21, 1999 (the "**RS Trust**" and, with CLG and the CG Trust, the "**G&S Members**"), and any Persons who later become Members. Capitalized terms have the meanings given or cross-referenced in **Exhibit A**. This Agreement amends and restates in its entirety the CFS Limited Liability Company Agreement dated as of April 24, 2017.

The Parties agree:

## 1. ORGANIZATIONAL MATTERS

1.1    **FORMATION; MEMBERS RIGHTS AND OBLIGATIONS**. The Company was formed as a Delaware limited liability company when the Certificate of Formation was filed with the Delaware Secretary of State. The Members' rights and obligations are as provided in the Act, except as this Agreement otherwise specifies. This Agreement will govern if there is any inconsistency between this Agreement and any non-mandatory provisions of the Act.

1.2    **NAME; TERM**. The Company's name is "Computer Forensic Services, LLC". The Company will continue in existence until dissolved under the Act and this Agreement.

1.3    **OFFICES; AGENT**. The Board can designate and change the location of the Company's principal office and other offices. The Company's registered office in Delaware and registered agent for service of process are as stated in the Certificate of Formation. The Board can change the Company's agent for service of process.

1.4    **PURPOSE; POWERS**. The Company can engage in any lawful activity for which a limited liability company can be formed under the Act, and exercise all rights, powers, privileges and other incidents of ownership of its assets and business.

1.5    **FOREIGN QUALIFICATION**. The Board can cause the Company to qualify as a foreign limited liability company in each jurisdiction where qualification is required, and make filings and take other actions to keep the Company in good standing in that jurisdiction. The Board and, if so requested by the Board, each Member will execute, acknowledge and deliver any certificates and other instruments desirable to qualify, continue or terminate the Company as a foreign limited liability company; *provided*, that no Member will have to file any general consent to service of process or to qualify as a foreign entity in any jurisdiction in which it is not already so qualified.

1.6    **NO STATE LAW PARTNERSHIP**. Nothing in this Agreement will be construed to (a) create a partnership among the Members (except for federal and state income tax purposes), (b) cause any Member to be a partner or joint venturer of any other Member, (c) authorize any Member to act as general agent for any other Member, or (d) subject the Members to joint and several liability or vicarious liability for the obligations of the other Members or the Company.

Ex. A

9

## 2.  UNITS

2.1    CLASSIFICATION AND AUTHORIZATION.  The ownership of the Company is divided into and represented by Units.  The initial number of Units the Company is authorized to issue is 10,000, of which 8500 are designated Common Units, and 1500 are designated Preferred Units.  Each Preferred Unit has a "**Stated Amount**" of $1,333.33 and will have the other rights and preferences stated in this Agreement.

2.2    MEMBERSHIP INFORMATION.  **Exhibit B** provides notice addresses and Unit ownership information for each Member.  The Board will (a) cause **Exhibit B** to be updated to reflect the addition or removal of Members, changes in the Beginning Capital or Capital Contributions of any Member and changes in the number of Common Units or Preferred Units held of record by any Member, and (b) promptly provide copies of each update to all Members.

2.3    CHANGE EVENTS.  In connection with a Change Event, the Preferred Unit Holders may elect, by notice to the Company and each other Member at least 15 days before the Change Event, either (a) to receive, in exchange for their Preferred Units, and before any distributions or payments to the holders of any other current or future class of equity interests in the Company, an amount equal to the aggregate Stated Amount of such units, minus Discretionary Distributions paid in respect of such units (collectively, the "**Preferred Preference**"); or (b) an amount equal to the proceeds from the Change Event (net of transaction costs) multiplied by the Overall Percentage Interests attributable to the Preferred Units.  The Board can determine in good faith the value of any non-cash items to be distributed in connection with the Change Event.   The Company will notify the Preferred Unit Holders in writing at least 30 days before any Change Event (such notice to include or be accompanied by all relevant information and documents pertaining to the Change Event).  The Preferred Unit Holders' election may be conditioned on there being no change in the financial terms of the Change Event after that election, and, if so conditioned, the Preferred Unit Holders may change their election upon their receipt of notice of such a change (which notice the Company will promptly provide).  Upon this election and payment to the Preferred Unit Holders of the amounts due, the Preferred Units will be cancelled.  Nothing in this **Section 2.3** will be deemed to conflict with or supersede the approval requirements of **Section 4.3.2**.

## 3.  MEMBERS

3.1    ADMISSION.  CFS and the G&S Members are confirmed as Members duly admitted to the Company.  Other Persons may be admitted (a) as Members upon their purchase of newly-issued Units (assuming compliance with **Section 4.3.2(c)** and the other applicable provisions of this Agreement) and their execution and delivery of a counterpart of this Agreement; or (b) as Substitute Members under **Section 9.6**.

3.2    LIMITED LIABILITY.  Except as stated in this Agreement or required by Law, no Member will be (a) personally liable for any Company debt, duty (including any fiduciary duty), obligation or liability, whether arising in contract, tort or otherwise, solely because the Member is a Member, or (b) will be obligated to restore any negative balance in its

Ex. A
10

Capital Account or to return any Distribution.  If, despite the foregoing, a final and binding decision of a court finds that any Member must restore such negative balance or return or pay any part of any Distribution, such obligation will be that of such Member alone and not of any other Member.

3.3    **VOTING.  Section 4** provides that all power and authority to manage the Company's business and affairs are vested exclusively in the Board, except for Authorized Approvals.  The Members intend that no vote or consent of any Member is required, and irrevocably waive and disclaim all rights to vote as Members, except for Authorized Approvals.  If an Authorized Approval is required of all Members, the Common Units and Preferred Units will vote as a single class, with each Unit entitled to one vote.  If any Unit is Transferred to a Person not admitted as a Member under **Section 9**, or until the Assignee is admitted as a Substitute Member, any voting rights attributed to that Unit will remain with the Transferring Member (whether or not the Transfer is of all of the Transferring Member's Units).  No Member, acting solely as a Member, is a Company agent, nor does any Member, unless authorized in writing by the Board, have any power or authority to bind the Company or act on its behalf, to pledge the Company's credit or assets, to execute any instrument on the Company's behalf, or to render the Company liable for any purpose.

3.4    **MEETINGS; CONSENTS**.  Any Member or Manager can call Member meetings or solicit Member consents, but only for Authorized Approvals.  The Board is authorized and empowered to establish all rules and procedures pertaining to any such meetings, including notice and waiver-of-notice requirements, quorum requirements, proxy requirements, requirements for meeting by conference telephone call or video conference, and any other rules or procedures deemed advisable by the Board.  In the Board's sole discretion, the Members may also act by unanimous written consent.

3.5    **RIGHTS OF LEGAL REPRESENTATIVES**.  If a Member who is an individual dies or becomes Incapacitated, his or her executor, administrator, trustee, or other legal representative can exercise all rights to settle his or her estate or administer his or her Property.  The Member's Membership Interest will continue to be subject to this Agreement, including the Transfer restrictions in **Section 9**.

3.6    **MEMBER REPRESENTATIONS**.  Each Member represents and warrants that, as of the Effective Date, (a) it has acquired, and holds, its Membership Interest for its own account and not with a view to, or for sale in connection with, any Transfer of such Membership Interest; and (b) its execution, delivery and performance of this Agreement and the transactions contemplated by this Agreement will not (i) violate any order, judgment or decree of any court or other governmental agency or any arbitrator applicable to and known by the Member; (ii) conflict with, result in a breach of, or constitute (with notice or lapse of time or both) a default under, any material agreement to which the Member is a party or by which the Member or its assets are bound; or (iii) violate any Law.

3.7    **WITHDRAWALS OR RESIGNATIONS**.  No Member can withdraw or resign from the Company, except under **Section 9**.  Each Member waives all rights of a resigning or withdrawing member under Section 18-604 of the Act.

Ex. A
11

3.8    **ENFORCEMENT OF CERTAIN AGREEMENTS**.  Notwithstanding **Section 4.1** or any other
provision of this Agreement, the Preferred Unit Holders are irrevocably authorized and
empowered to directly enforce, or compel the Company to enforce, the Restrictive
Covenant Agreements, the Contribution Agreement and the IP Assignment.

3.9    **PARTITION**.  No Member will bring, and irrevocably waives any right to bring, an action
for partition against the Company or any of its assets.  The Members will not maintain
any action for dissolution and liquidation of the Company under Section 18-802 of the
Act or any similar applicable statutory or common law dissolution right without the
Board's unanimous vote or consent.

## 4.    MANAGEMENT AND CONTROL BY THE BOARD

4.1    **MANAGEMENT BY THE BOARD**.  Subject to the Act and any express Member action
requirements in this Agreement, the Board has the exclusive authority and power to
manage and govern all of the Company's business and affairs and to act on the
Company's behalf.  The Board (or officers authorized by the Board to act under its
direction) will exercise all of the Company's powers without any Member vote, consent
or other approval (subject to **Section 4.3**).

4.2    **BOARD OF MANAGERS**.

    4.2.1    **Composition**.  The Board will consist of up to five Managers.  CFS may appoint
up to four Managers (the "**CFS Managers**"). The initial CFS Manager will be
Mark Lanterman, who will have two votes until CFS appoints one or more
additional CFS Managers.  The G&S Members may appoint one Manager (the
"**Trust Manager**").  The initial Trust Manager will be CLG.  CFS may remove
and replace any CFS Manager; and the G&S Members holding a majority of the
Preferred Units may remove and replace the Trust Manager.  If CLG, dies,
becomes Incapacitated, or resigns from the Board, Robert Seidler or his designee
will become the Trust Manager.  The G&S Members may also have one non-
voting representative present at all Board meetings, solely as an observer and not
as a voting Board member.  The Company will pay the Trust Manager an annual
fee of $75,000, payable quarterly, subject to changes mutually agreed by the
Company, CLG and the RS Trust.

    4.2.2    **Meetings**.  The Board will meet as often as required, but at least once every six
months.  Any Manager can call a Board meeting.  Managers will receive at least
10 days' advance notice of any Board meetings, subject to waiver of notice by all
Managers, and *provided* that, in emergency situations, Managers will receive only
as much advance notice as is reasonably practicable under the circumstances.  A
quorum for the transaction of business by the Board is at least two Managers.
Each Member will use its reasonable best efforts to cause its Manager[s] to be
available for reasonably requested meetings.  Board meetings can be held by
telephonic conference call, video conference arrangements or other electronic
arrangements that allow each Manager to hear and be heard by all other
Managers.  If a Manager cannot attend an in-person Manager meeting, the

Ex. A
12

Manager may, at his or her option, (a) participate in the meeting by electronic arrangements; or (b) designate another representative of the Member that appointed that Manager (or an Affiliate of that Member) to participate in the meeting in-person or by electronic arrangements, with full power to act on the Manager's behalf.  The Board can also act by the written consent of a majority of the Managers (subject to **Section 4.3**), so long as the consent of all Managers is sought in writing at least 10 days before the consent is signed, and all Managers receive copies of any written consents signed by less than all Managers.

**4.3**    **VOTING.**

**4.3.1**    **Board Action**.  The Board will act by the majority vote of the Managers, subject to **Section 4.3.2**.  Each Manager will have one vote on all matters brought before the Board for approval.

**4.3.2**    **Trust Manager Approval**.  Notwithstanding any other provision of this Agreement, the following Company actions require the Trust Manager's prior affirmative vote or prior written consent:

(a)    entering into new lines of business unrelated to Company operations on the Effective Date;

(b)    entering into, or amending, agreements or arrangements with Related Persons of the Company, any Company subsidiary, or any other Company Affiliate;

(c)    issuing or selling equity interests in the Company senior in any way to the Preferred Units;

(d)    redeeming equity interests in the Company other than on a *pro rata* basis for all Members, or under **Section 10.1**;

(e)    disposing of material assets or making any material acquisition of the equity or assets of any third party, other than as part of a Change Event;

(f)    incurring aggregate Indebtedness, including any guarantee of Indebtedness, if it would cause total Company Indebtedness to exceed $500,000 ("**Permitted Indebtedness**"), or pledging material Company assets with respect to non-Permitted Indebtedness;

(g)    voluntarily filing for Bankruptcy;

(h)    amending this Agreement, the Certificate of Formation or equivalent organizational documents of the Company, other than in connection with a Change Event;

(i)    initiating litigation where the reasonably anticipated amount in controversy exceeds $500,000, or settling litigation for more than that amount;

(j)     forming a subsidiary, or making a minority or majority equity or debt investment in any third party (upon the formation of any subsidiary, the Members will amend this Agreement accordingly); and

(k)     hiring a new senior Company officer, or entering into new, or amending existing, employment agreements or arrangements with senior Company officers, or increasing the compensation of any Company officer above his/her compensation in effect on the Effective Date (it being understood that Mark Lanterman's annual salary as of the Effective Date is $400,000).

4.4    **VACANCIES**.  A Manager can resign from the Board, effective on delivery of a notice of resignation or at a later time the notice specifies.  Unless otherwise stated in the notice, acceptance of the resignation is not necessary to make it effective.   A Manager is deemed to have resigned when a Dissolution Event occurs with respect to the Manager. **Section 4.2.1** governs the replacement of a Manager who resigns, dies, is removed or becomes Incapacitated.

4.5    **EXPENSES**.  The Company will reimburse the Members on a periodic basis for all reasonable and properly documented out-of-pocket costs and expenses they and their designated Manager[s] incur to further the Business.

4.6    **LIMITED LIABILITY**.  Except as stated in this Agreement or required by Law, no Manager will be personally liable for any Company debt, obligation or liability, whether arising in contract, tort or otherwise, solely because the Manager is a Manager.  Neither the Company nor the Board will be deemed to guarantee the return of any Member's Capital Contribution or a profit for any Member from the Company's operations.

4.7    **MANAGER COMMITMENT**.  The Managers must devote the time, effort and skill reasonably required for the overall management of the Company.  However, as Managers, they do not have to devote all of their business time or efforts to the Company.

4.8    **PERFORMANCE OF DUTIES**.  Each Manager will owe to the Company and the Members the fiduciary duties that Delaware Law imposes on the managers of a Delaware limited liability company (absent contrary contractual provisions).  In performing Manager duties, each Manager may rely on information, opinions, reports or statements, including financial statements and other financial data, provided by the following persons or groups, unless the Manager has knowledge indicating reliance would be unreasonable, and *provided further* that the Manager acts in good faith and after reasonable inquiry when inquiry is indicated by the circumstances:

(a)     one or more Company officers, employees or other agents whom the Manager reasonably believes to be reliable and competent in the matters in question; or

(b)     any attorney, independent accountant, or other Person engaged by the Board for matters the Manager reasonably believes to be within the Person's professional competence.

Ex. A
14

## 5.  OFFICERS; APPOINTMENT AND REMOVAL

5.1    GENERAL.  Subject to **Section 4.3**, the Board may appoint one or more individuals as Company officers, delegate to them their duties and responsibilities, and determine their tenure of office, compensation and other terms of service.  Any number of offices can be held by the same individual.  The Company's initial officers are stated on **Exhibit C**.

5.2    APPOINTMENT AND REMOVAL.  Subject to any employment or consulting agreement, each officer will serve at the pleasure of the Board, which can remove any officer, with or without cause, and modify or limit the duties and responsibilities of any officer.

## 6.  CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

6.1    BEGINNING CAPITAL.  Each Member will be credited with the Beginning Capital stated on **Exhibit B** in respect of the Member's Common Units or Preferred Units stated on **Exhibit B**.  No Member will have to contribute any additional capital to the Company.

6.2    NO RETURN OF CAPITAL CONTRIBUTION; NO INTEREST.  Except as otherwise provided in this Agreement, no Member is entitled to demand or receive the return of the Member's Capital Contributions or to be paid interest regarding the Member's Capital Account or Capital Contributions.  No Member is required to contribute or to lend any money or Property to the Company to enable the Company to return any other Member's Capital Contributions.

6.3    CAPITAL ACCOUNTS.  The Company will establish and maintain separate Capital Accounts for each Member and Assignee in accordance with **Exhibit D**.

## 7.  ALLOCATIONS AND DISTRIBUTIONS

7.1    ALLOCATIONS OF NET PROFITS AND NET LOSSES.  All allocations of Net Profits and Net Losses and any other item of Company income, gain, loss and deduction must be made in accordance with **Exhibit D**.

7.2    DISTRIBUTIONS.

    7.2.1    **Discretionary Distributions**. The Company can make non-Tax Distributions ("**Discretionary Distributions**").  Subject to **Section 2.3**, the Company will make Discretionary Distributions to holders of Units *pro rata*, in accordance with their respective Overall Percentage Interests.

    7.2.2    **Effect on Preferred Units**.  Discretionary Distributions (except as otherwise provided in this Agreement) regarding each Preferred Unit will be applied first to reduce its Preferred Preference.

    7.2.3    **Restriction on Distributions**.  No Distribution or Tax Distribution will be made if it would violate any Credit Documents, this Agreement or applicable Law.  The Board can base a determination that a Distribution does not cause such a violation on: financial statements prepared on the basis of reasonable accounting practices

and principles, a valuation by a recognized valuation expert, or any other reasonable method.

**7.2.4**    **Determination of Distributions among Members**.  All Distributions will be made to the Persons who are Members or Assignees on the record date the Board establishes, as their interests then appear on the Company's books and records.

**7.2.5**    **Form of Distributions**.  No Member or Assignee has any right to demand any Distribution from the Company in any form other than cash.

**7.3**    TAX DISTRIBUTIONS.

**7.3.1**    **Amount**.  The Company will, to the extent it has sufficient cash (as determined by the Board in its discretion), distribute to each Member for each taxable year cash equal to the Member's Tax Liability Amount (a "**Tax Distribution**").  "**Tax Liability Amount**" for a taxable year means an amount equal to the Effective Tax Rate, multiplied by (a) the taxable income and gain allocated to the Member for that year under **Exhibit D** (as shown on the Company's Schedule K-1), minus (b) the cumulative losses allocated to the Member to the extent those losses have not previously reduced taxable income and gain under this provision (taking into account applicable alternative minimum tax limitations); *provided, however*, that (w) Member-level adjustments under Section 743 of the Code will not be taken into account, (x) to the extent that a limitation on the use of prior losses to offset future income exists for state or local income tax purposes, appropriate adjustments will be made to the calculation of the Tax Liability Amount to account for such limitation, (y) income allocated to the Preferred Unit Holders pursuant to Paragraph 1.2 of Exhibit D corresponding to cash distributions pursuant to **Section 7.2.1** will not be taken into account, nor will any such cash distribution be considered a Tax Distribution, and (z) income allocated to the Common Unit Holders pursuant to Paragraph 1.2 of Exhibit D corresponding to cash distributions pursuant to **Section 7.2.1** will not be taken into account, nor will any such cash distribution be considered a Tax Distribution. For purposes of this Agreement, all Distributions to the Members (other than Distributions described in clauses (y) and (z) above) in respect of a taxable year will be treated as Tax Distributions to the extent of their respective Tax Liability Amounts for such year.  For purposes of this Agreement, all Distributions to the Members in respect of a taxable year will be treated as Tax Distributions to the extent of their respective Tax Liability Amounts for such year.

**7.3.3**    **Timing**.  Tax Distributions will be made quarterly on the basis of estimates.  The Tax Distribution for the first quarter of each fiscal year will also reflect a true-up for the previous four quarters based on actual income, gains and losses for those quarters.

**7.3.4**    **Insufficient Cash**.  If there is insufficient cash to distribute to each Member an amount equal to each Member's Tax Liability Amount, the Company will (a) make Tax Distributions under this **Section 7.3** to the Members with Tax Liability

Amounts *pro rata* in accordance with their Tax Liability Amounts; and (b) make up the shortfalls when sufficient cash becomes available and before any other Distribution is made.

**7.3.5    Effect on Preferred Units**.  Tax Distributions will not be treated as Distributions reducing the Preferred Preference under **Section 7.2.2**.

**7.4    AMOUNTS WITHHELD**.  The Company can withhold from Distributions, and pay to any Taxing Jurisdiction, any amounts that jurisdiction require to be withheld.  Any withheld amounts will be treated as amounts distributed to the respective Members or Assignees on which the withholding was imposed.  To the extent the Company pays over to any Taxing Jurisdiction any amounts pursuant to a withholding obligation with respect to a Member in excess of available Distributions to which the Member is otherwise entitled, the Member will promptly reimburse to the Company an amount equal to the excess upon request from the Company.

**7.5    NO RECOURSE AGAINST OTHER MEMBERS**.  Each Member (a) must look solely to Company assets for all Distributions, for the repayment of any loans to the Company and for the return of the Member's Capital Contribution and share of Net Profits or Net Losses, and (b) has no recourse for those amounts (upon a Dissolution Event or otherwise) against any other Member.

## 8.  TAX MATTERS

**8.1    TAX RETURNS AND ELECTIONS**.  The Board will arrange for the preparation and timely filing of all required Company tax returns.  The Board will provide the Preferred Unit Holders (a) copies of the Company's proposed federal and material state income tax returns for the Preferred Unit Holders' review and comment (which comments will be considered by the Board in good faith) at least 30 days before they are filed; (b) the opportunity to review and comment (which comments will be considered by the Board in good faith) in advance all income allocations among the Members; and (c) access to the Company's tax return preparers during the return preparation process and the opportunity to monitor that process.  The Board can determine whether to make or revoke any available Code-related election; *provided* that prior to making any material election or revocation of any such election, the Board will provide the Preferred Unit Holders notice of the election or revocation requesting their review and comment (which comments will be considered by the Board in good faith) at least 30 days before the election or revocation is made.  Upon request, each Member will supply the information necessary to give effect to the election.  Within 60 days after the end of each taxable year, after consultation with the Tax Matters Member, the Board will cause to be sent to each Person that was a Member during that year estimates of the amounts to appear on Schedule K-1, "Partner's Share of Income, Credits, Deductions, Etc." (and any corresponding state and local schedule(s), return(s) or other form(s)) and within 100 days after the end of each taxable year, will use reasonable efforts to send copies of the actual Schedule K-1 (and any corresponding state Schedule(s) K-1), or any successor schedule or form.

8.2 **TAX MATTERS MEMBER**.  The Tax Matters Member, as defined in Code Section 6231 as "tax matters partner," will represent the Company (at the Company's expense) in examinations of the Company's affairs by tax authorities, including any resulting judicial and administrative proceedings, and will spend Company funds for professional services and other associated costs.  Each Member will cooperate with the Tax Matters Member in any such examinations and proceedings.  The Tax Matters Member will promptly provide each Member with copies of any material correspondence received by the Tax Matters Member with respect to any Tax Return or tax audit of the Company.   The Tax Matters Member will cause each Trust to be designated as a "notice partner" under Section 6223 of the Code.

## 9.  TRANSFER OF UNITS; ADDITIONAL MEMBERS

9.1 **RESTRICTIONS**.  No holder of Units will, directly or indirectly, Transfer all or any portion of, or any interest in, its Units, except in accordance with this **Section 9**.  Any other Transfer or attempted Transfer of Units will be null and void, will not be recorded on the Company's records of equity ownership, and will not be recognized by the Company.  Each transferee must hold any Transferred Units subject to this Agreement and must not make any further Transfers except in accordance with this Agreement.

9.2 **PERMITTED TRANSFERS**.  Notwithstanding **Section 9.1**, a holder (the "**Transferring Member**") can Transfer or cause to be Transferred all or any portion of the Transferring Member's Units to a Permitted Unit Transferee with respect to the Transferring Member (a "**Permitted Transfer**").

9.3 **EFFECTIVE DATE OF PERMITTED TRANSFERS.**  Once all documentation required by this **Section 9** has been received and accepted by the Board, the Board, the Transferring Member and the Permitted Unit Transferee will agree on a mutually acceptable effective date of the Permitted Transfer.  On that date, the Permitted Transfer will be shown on the Company's books and records.  Distributions for the period before that effective date will be paid to the Transferring Member, and Distributions for the period after that effective date will be paid to the Permitted Unit Transferee.

9.4 **LIMITATIONS ON TRANSFER**.  Notwithstanding any other provision of this Agreement, no Member can Transfer its Units if (a) as a result of the Transfer: (i) based on the advice of counsel to the Company, the Company's treatment as a partnership for tax purposes would be jeopardized; (ii) the Company or any non-transferring Member would become subject to any governmental controls or regulations that materially affect the Business or that Member; or (iii) the Company or any non-transferring Member becomes subject to any additional material tax liability to which it was not previously subject; or (b) the transaction does not comply with Law (including any securities Law) or any instrument to which the Company is a party or by which it is bound (unless any required permit, approval, consent or waiver has been obtained and is in effect), or if acceleration of any Company debt (including any mortgage on Company property) will occur because of any such transaction.  Any purported transaction that would cause any such result will be null and void.

9.5    RIGHTS OF ASSIGNEES.  If a Transfer of all or a portion of a Transferring Member's Units is otherwise permitted by this **Section 9**, the Permitted Unit Transferee of those Units will become an Assignee of the Units if the transferee agrees in writing to be bound by this Agreement (including the Transfer restrictions in this **Section 9**) as though the Assignee were a Member.  Such a Transfer will not, by itself, entitle the Assignee to become a Member or to exercise any Member rights.  Any Assignee who has not become a Substitute Member under **Section 9.6** will be deemed to take only the Transferring Member's right to share in income, gains, losses, deductions, credits (and similar items) of, and to receive Distributions from, the Company, but will acquire no right to any legal interest in the Company nor the right to exercise any power granted to a Member under this Agreement or applicable Law (including the right to vote, participate in management or, except as provided by Section 18-305 of the Act, the right to information concerning the Company's business).  Any Assignee who has become a Substitute Member under **Section 9.6** will acquire the right to the Transferring Member's legal interest in the Company and the right to exercise any power granted to the Member under this Agreement or applicable Law.  Any Assignee (whether or not admitted as a Member or Substitute Member) or Substitute Member will be subject to all obligations and restrictions under this Agreement.

9.6    SUBSTITUTE MEMBERS AND ASSIGNEES.  No Assignee, other than an existing Member, may become a Substitute Member in place of a Transferring Member unless all of the following conditions are satisfied: (a) the Transferring Member and the Assignee have executed and delivered to the Board (i) a fully executed written instrument of assignment confirming their intention that the Assignee become a Substitute Member in the Transferring Member's place; and (ii) any other instruments the Board reasonably deems desirable to admit the Person as a Substitute Member in accordance with applicable Law; (b) the Assignee has executed and delivered a counterpart of this Agreement; and (c) the Board approves the Assignee's admission as a Substitute Member, *provided* that the Board may not unreasonably disapprove a Permitted Unit Transferee's admission as a Substitute Member.  Each Assignee, irrespective of whether it intends to become a Substitute Member, will be required to satisfy the following conditions: (y) the Transferring Member and the Assignee have executed and delivered to the Board (i) a fully executed written instrument of assignment; and (ii) any other instruments the Board reasonably deems desirable; and (z) the Assignee has executed and delivered an instrument agreeing to be bound by this Agreement regarding the interest assigned.

9.7    REMEDIES AND PENALTIES FOR NONCOMPLIANCE.  In addition to any other remedies available at Law or in equity for a Member's breach or attempted breach of this **Section 9**, the Company will be entitled to injunctive relief and to specific performance of that section.

9.8    CERTAIN RESTRICTIONS RELATING TO CFS.  Mark Lanterman, by his execution of this Agreement, agrees not to, directly or indirectly, (a) Transfer or cause to be Transferred all or any portion of, or any equity interest in CFS (other than to a Permitted Stock Transferee); or (b) permit CFS to (i) issue or sell equity interests or rights to acquire equity interests in CFS, or (ii) directly or indirectly, Transfer or otherwise dispose of its

Membership Interests, except as permitted under this Agreement, or (iii) dissolve, liquidate or wind up CFS' affairs until it no longer holds any Membership Interests.

## 10.  ADDITIONAL RIGHTS AND OBLIGATIONS

**10.1**   **INVESTOR LIQUIDITY RIGHT**.

**10.1.1  Redemption Price**.  After  the earlier of (a) a Major Default Event as defined below; or (b) the 6th anniversary of the closing, either CLG or the RS Trust (in either case, the "**Initiating Member**") may, by notice delivered to the Company (a "**Liquidity Notice**"), require that the Company redeem all of the Preferred Units in cash for the greater of  the aggregate Stated Value of the Preferred Units or the fair market value of such units, with no discount for lack of control, lack of marketability or other such considerations ("**FMV**").

**10.1.2  Determination of Redemption Price**.

(a)     *Negotiation*.  During the 15 days following the delivery of the Liquidity Notice (the "**Negotiation Period**"), CFS and the Initiating Member will attempt in good faith to agree on the FMV.  If they do so within the Negotiation Period, and (a) the agreed FMV is greater than the aggregate Stated Value of the Preferred Units, the agreed FMV will be the redemption price of the Preferred Units, or (b) the Stated Value is greater than FMV, the Stated Value will be the redemption price of the Preferred Units.

(b)     *Appraisal*.  If there is no such agreement on FMV during the Negotiation Period, the Initiating Member will, within seven days from the end of the Negotiation Period, submit to the Company the names of three reputable and experienced appraisal firms.  Within three days after such submission, the Company will select, by written notice to the Initiating Member, one of these three firms to appraise the Preferred Units.  If the Company does not do so within such three-day period, the Initiating Member Trust may select the appraiser.  Within five days after selection of the appraiser, (i) the Company will use its reasonable best efforts to engage the appraiser to perform the services contemplated by this Agreement, and (ii) the Company and the Initiating Member will each submit to the selected appraiser the submitting party's determination of FMV, along with any supporting documentation or materials the submitting party wishes to provide.  The Company and the Initiating Member will each instruct the appraiser to rely only on the submitted materials, choose one of the two submitted determinations of FMV as soon as practicable, and notify the Company and the Initiating Member of the appraiser's choice.  The  appraiser's fees and expenses will be paid by (A) CFS if the appraiser chooses the FMV determination submitted by the Initiating Member, or (B) by the G&S Members (in proportions corresponding to their Overall Percentage Interests) if the appraiser chooses the FMV determination submitted by CFS.

(c)    *Payment*.  Within 30 days after FMV is determined as described above, the Company will pay the redemption price of the Preferred Units in cash to the G&S Members (by wire transfer of immediately available funds to their respective bank accounts, as described in notices the G&S Members provide to the Company) in proportion to their Overall Percentage Interests

(d)    *Cooperation*. Once a Liquidity Notice is delivered, all the G&S Members will be obligated to act in good faith to fully and actively cooperate and participate in the redemption process, as reasonably requested by the Initiating Member, such cooperation and participation to include executing and delivering documents, and using their reasonable best efforts to consummate the redemption contemplated by this **Section 10**.

**10.2**    PREFERRED UNIT HOLDERS INFORMATION RIGHTS.

**10.2.1 Inspection**.  For as long as a Trust owns any outstanding equity interests in the Company, the Company will permit that Trust's representatives to visit and inspect any Company properties, examine its business, financial and operating records and make copies of those records for any purpose reasonably related to the Trust's interest in the Company and during normal business hours upon reasonable advance notice.

**10.2.2 Financial and Business Information**.  For so long as any Trust (including any Permitted Unit Transferee of such Trust) owns any outstanding equity interests in the Company, the Company will use reasonable best efforts to deliver to such Trust:

(a)    within 30 days after the end of each month, and 60 days after the end of each fiscal year, Financial Information for such period;

(b)    before December 1 of each fiscal year, the Annual Budget for the succeeding year, presented on a monthly basis, including revenues, expenses, debt levels, cash flows, capital expenditures, distributions and balance sheet items; and

(c)    any revisions to the Annual Budget promptly after adoption.

**10.2.3 Request**.  At the LG Trust's request, the Company will (a) deliver to the G&S Members any other reasonably available data and information concerning the Company or the Business; and (b) make available to the Trust Manager the Company's senior operations officers, financial officers, and outside accountants.

## 11.  BOOKS AND RECORDS

**11.1**    BANK ACCOUNTS.  All Company funds must be deposited in a bank account or accounts opened in the Company's name.  The Board will determine the institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who have authority with respect to the accounts and the funds in those accounts.

**11.2** **BOOKS AND RECORDS**. The Company will keep or cause to be kept complete and accurate records, including supporting documentation, of its transactions. The Company's financial books, records and accounts must be maintained in a consistent manner.

**11.3** **FISCAL YEAR**. The Company's fiscal year-end is December 31.

## 12. DISSOLUTION AND WINDING UP

**12.1** **DISSOLUTION**. The Company will be dissolved, its assets disposed of, and its affairs wound up upon the first of the following to occur:

(a)    The Board's vote, consent or approval (subject to **Section 4.3.1**);

(b)    A Dissolution Event with respect to the last remaining Member;

(c)    The sale of all or substantially all of the Company's assets or any similar transaction with similar effect; or

(d)    The happening of any other event that makes it unlawful or impossible to carry on the Business.

**12.2** **CONTINUATION OF THE COMPANY**. Except as otherwise provided in **Section 12.1(b)**, a Member's Dissolution Event will not cause the Company to dissolve or wind up its affairs. The Members do not have the right to dissolve the Company under Section 18-801(a)(3) of the Act.

**12.3** **EFFECT OF DISSOLUTION**. Upon dissolution, the Company will cease carrying on (as distinguished from winding up) the Company's business, but the Company is not terminated, and will continue until the winding up of the Company's affairs is completed, and a certificate of dissolution has been filed with the Delaware Secretary of State.

**12.4** **DISTRIBUTION OF ASSETS ON DISSOLUTION**. Upon the winding up of the Company, the Company's Property will be liquidated, and the net proceeds distributed first, to creditors, including any Members who are creditors, to the extent permitted by Law, to satisfy all Company liabilities and then: (a) first, to the holders of any then outstanding Preferred Units as provided in **Section 2.3**, and (b) second, to the holders of Common Units in accordance with their respective Class Percentage Interests. These liquidating Distributions to Members will be made (y) by the end of the Company's taxable year in which the Company is liquidated, or, if later, within 90 days after the liquidation; and (z) in cash or Property (which must be distributed proportionately, except as otherwise unanimously approved by the Board), or partly in both, as the Board determines. No Member has the obligation to contribute or advance any funds or other Property to the Company by reason of any negative or deficit balance in the Member's Capital Account during or upon completion of winding up or at any other time.

**12.5** **WINDING UP AND CERTIFICATE OF DISSOLUTION**. The winding up of the Company will be completed when all of its debts, liabilities and obligations have been paid and

discharged or adequately provided for, and all remaining Company property and assets have been distributed to the Members. Upon this completion, a certificate of dissolution containing the information the Act requires must be delivered to the Delaware Secretary of State for filing.

## 13. INDEMNIFICATION

13.1    **INDEMNIFICATION BY COMPANY**.  To the fullest extent permitted by Law, the Company indemnifies and holds harmless each Indemnified Person against all Claims relating to the Indemnified Person's status or activities as an Indemnified Person, or to the Business. The Company will reimburse an Indemnified Person's reasonable expenses paid or incurred in investigating, preparing or defending itself against any Claim, as those expenses are paid or incurred. A Person will be considered an Indemnified Person whether or not the Person has the status required to be an Indemnified Person when any such Claim is made or maintained. This **Section 13** does not apply to that portion of any Claim determined by the final decision (from which an appeal cannot be, or is not, timely taken) of a court of competent jurisdiction to have been caused by the Indemnified Person's gross negligence, bad faith, intentional misconduct or intentional material breach of this Agreement. Any payments made to or on behalf of a Person later determined not to be entitled to them must be refunded to the Company by the Person promptly following that determination.

13.2    **NOT EXCLUSIVE**.  The rights to indemnification and the advancement of expenses in this **Section 13** are not exclusive of any other right that any Indemnified Person may have or later acquire under any statute, agreement or otherwise.

13.3    **INSURANCE**.  The Board will periodically consider whether the Company should obtain (or change the terms of existing) directors and officers liability insurance covering the Managers regarding acts or omissions they commit as Managers.

13.4    **LIMITATION OF LIABILITY**.  An Indemnified Person will not be liable to the Company or any Member, and no Member will seek to hold any Indemnified Person liable, for any act or omission performed or omitted by the Indemnified Person pursuant to authority granted to the Indemnified Person by this Agreement, unless the act or omission was attributable to the Indemnified Person's gross negligence, bad faith, intentional misconduct or intentional material breach of this Agreement. The Board can exercise any of the powers granted by this Agreement and perform any of the duties imposed upon it by this Agreement either directly or by or through its agents, and the Managers are not responsible for any misconduct or negligence by any such agent appointed by the Board.

## 14. MISCELLANEOUS PROVISIONS

14.1    **ADDITIONAL DOCUMENTS AND ACTS**.  Each Member will sign and deliver any additional documents and instruments, and perform any additional acts, that are commercially reasonable and desirable to perform or evidence its obligations in this Agreement.

14.2    **PARTIES IN INTEREST**.  Nothing in this Agreement relieves or discharges any obligation or liability of any third Person to any Member or Manager. No provision of this

Agreement gives any third Person any right of subrogation or action over or against any Member.

**14.3    COMPLETE AGREEMENT**.  This Agreement is the complete and exclusive statement of the Members' agreement of the Members on matters covered by this Agreement.  It replaces and supersedes the Members' prior written or oral agreements or statements on those matters.

**14.4    AMENDMENTS; WAIVERS**.  This Agreement can be amended only by the written agreement of all Members.  Any waiver of any right or remedy requires the waiving Party's written consent.  No Party's failure to insist on the strict performance of any provision of this Agreement, or to exercise any right or remedy, will be deemed a waiver of such performance, right or remedy or of any other provision of this Agreement.

**14.5    COUNSEL**.  Each Member (a) has been represented by its counsel in connection with this Agreement; and (b) has read and understands this Agreement.

**14.6    GOVERNING LAW**.  Delaware Law (without regard to principles of conflict of laws) will govern the interpretation and enforcement of this Agreement, as well as any claims or disputes otherwise related to or arising out of this Agreement.

**14.7    CONFIDENTIALITY; NON-DISPARAGEMENT**.

**14.7.1    Confidential Information**.  Each Party agrees to keep and maintain strictly private, secret and confidential, and to not disclose to any other Person, any non-public information (whenever or however received) regarding the Company, the Members, the Managers and each of their respective Affiliates and Related Persons (together, the "**Covered Parties**"), including: (a) all information regarding each Covered Party's status, operations, undertakings, prospects, finances, projections, legal proceedings, disputes, strategies, trade secrets, inventions, developments, methods, marketing plans, budgets, investments, policies, clients, customers, suppliers and personnel; (b) the Company's federal, state and local income tax information or tax returns; and (c) all information regarding the identity of any Member, the date on which each became a Member, any Capital Contributions of a Member, or the Units owned by any Member (collectively, "**Confidential Information**"); *provided, however*, that (y) the Managers may disclose Confidential Information in connection with a  Change Event, and any Member may disclose Confidential Information in any proposed sale by the Member of its Units in accordance with this Agreement, in each case to a Person who has first signed and delivered to the Company a confidentiality agreement in customary form; and (z) any Party may make disclosures under **Sections 14.7.2** and **14.7.3**.  "Confidential Information" will not include information that is or becomes public through no act or omission by the Member that received it.

**14.7.2    Use of Confidential Information; Disclosure to Advisers**.  Each Party agrees it will not use any Confidential Information for any purpose, competitive or non-

competitive with the Company, except purposes related to the Business. However, each Party may disclose Confidential Information to its professional legal, financial or accounting advisers, so long as the Party informs them of the restrictions in this **Section 14.7**, and the advisers are subject to confidentiality obligations regarding the Confidential Information that are comparable to those in this Agreement. A Party will be responsible for any breach of this **Section 14.7** by its advisers and other representatives.

14.7.3 **Required Disclosure**. If a Party or any of its representatives is required to disclose any Confidential Information in any judicial, arbitral or other legal proceeding, or pursuant to a governmental order or request, or similar legal process, the Party will, to the extent permitted by Law, give the Company and the other Parties prompt notice (but in any case within two business days) of the request or requirement so the Company and/or any other affected Parties may seek an appropriate protective order against disclosure of the Confidential Information, and the Party or representatives subject to the legal requirement will cooperate reasonably with the Company and any other affected Parties to obtain the protective order. The Company and/or the affected Parties may waive compliance with these requirements, but will only be required to do so to the limited extent necessary to comply with the legal requirement if a protective order against disclosure of the Confidential Information is not obtained.

14.7.4 **No Disparagement**. No Member or Manager will, and each will cause its Affiliates not to, condemn, criticize, ridicule or otherwise disparage or put in disrepute the Company or its Affiliates, successors or assigns, or its present and former Managers, Members, officers, agents, employees, products or services, whether orally or in writing, or otherwise directly or by implication in communication with any person, including customers of the Company, or agents with whom the Company does business; *provided, however*, that a Member, Manager or Affiliate may respond truthfully to a lawfully-issued subpoena, court order or government inquiry.

14.7.5 **Opportunities**. Before any G&S Member invests in, or otherwise becomes involved with (including as a manager, member, director, officer, equity owner, partner, joint venturer, employee, independent contractor, consultant, advisor or agent), an entity primarily engaged in substantially the same business as the Company, the G&S Member will consult with Mark Lanterman (unless prohibited from doing so by a non-disclosure or other agreement or, in the case of the RS Trust, the policies and procedures of, or laws or regulations applicable to, Seidler Kutsenda Management Company, LLC). In any situation involving such an investment or involvement, the relevant G&S Member will in any case continue to be bound by the above confidentiality obligations.

**14.8** **NOTICES**. All communications under this Agreement (including notices, consents, approvals and waivers) should be marked "Confidential" and must be in writing and will be considered given (a) when delivered by hand; (b) when sent by electronic mail (*provided* that a confirmation is sent within two business days by another means of

delivery contemplated by this section); (c) when received after being mailed by registered or certified mail, postage prepaid, return receipt requested; and (d) when received if sent via nationally recognized commercial courier, in each case to the street addresses or electronic mail addresses indicated on **Exhibit B** (except as otherwise specified in writing by any Member to the others).

14.9   COUNTERPARTS.  This Agreement may be executed in one or more counterparts, including those sent by facsimile transmission or electronic PDF file, if manually signed counterparts are sent within one day by registered mail or nationally-recognized courier service.  Each counterpart will be deemed an original, but all counterparts taken together will constitute one agreement.

14.10   SEVERABILITY.  If a court holds any provision of this Agreement to be illegal, invalid or unenforceable, that provision will be reformed, construed and enforced as if it had been drafted so as not to be illegal, invalid or unenforceable, and the illegality, invalidity or unenforceability will have no effect upon, and will not impair the enforceability of, any other provision of this Agreement, so long as the economic or legal substance of the arrangements and transactions contemplated by this Agreement are not affected by the reformation, construction or enforcement in any manner materially adverse to any Party.

14.11   COMPLIANCE WITH APPLICABLE LAWS.  No provision of this Agreement will be interpreted in a way that would cause a violation of Laws.

14.12   NO THIRD-PARTY BENEFICIARIES.  This Agreement is for the exclusive benefit of the Members, the Managers and the Company and their respective successors and permitted assigns.  Except for the foregoing, this Agreement is not intended to benefit or create rights in any other Person or governmental authority, including (a) any Person or governmental authority to whom any debts, liabilities or obligations are owed by the Company, any Member or any Manager; or (b) any liquidator, trustee or creditor acting on the Company's behalf, and no such creditor or any other Person or governmental authority will have any rights under this Agreement.

14.13   CERTAIN RULES OF CONSTRUCTION.

14.13.1   **Ambiguities**.  Any ambiguities in this Agreement will be resolved without reference to which Party took the lead in drafting it, notwithstanding any statute or rule of law to the contrary.

14.13.2   **Interpretation**.  Unless the context otherwise requires: (a) "or" is not exclusive; (b) words in the singular include the plural, and vice versa; (c) each reference to a law, statute, rule or regulation, is deemed followed by "as amended from time to time"; (d) "desirable" includes "necessary," "convenient" and "incidental"; (e) "including" and "includes" imply no limitation; and (f) pronouns of either gender or neuter include the other pronoun forms.  References to sections or exhibits are to the sections and exhibits of this Agreement, unless otherwise indicated.

18

**14.13.3  Headings; Exhibits**.  The headings in this Agreement are only for convenience and are not to be considered in interpreting this Agreement.  All exhibits attached to this Agreement are incorporated in it.

*[Signature page follows.]*

The Members have executed and delivered this Amended and Restated Limited Liability Company Agreement as of the Effective Date.

**COMPUTER FORENSIC SERVICES, INC.**

By: _____

Name: Mark Lanterman
Title: Chief Technology Officer

**CARL LENNART GOLBRANSON**

**CAROL GOLBRANSON REVOCABLE TRUST DTD 10/19/98**

By _____
Carol Golbranson, Trustee

**THE ROBERT SEIDLER REVOCABLE TRUST DATED OCTOBER 21, 1999.**

By: _____
Robert Seidler, Trustee

For Purposes of Section 9.8:

_____
Mark Lanterman

[SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF COMPUTER FORENSIC SERVICES, LLC]

The Members have executed and delivered this Amended and Restated Limited Liability Company Agreement as of the Effective Date.

**COMPUTER FORENSIC SERVICES, INC.**

By: _____
     Name:  Mark Lanterman
     Title:  Chief Technology Officer

_____
**CARL LENNART GOLBRANSON**

**CAROL GOLBRANSON REVOCABLE TRUST DTD 10/19/98**

By: _____
     Carol Golbranson, Trustee

**THE ROBERT SEIDLER REVOCABLE TRUST DATED OCTOBER 21, 1999.**

By: _____
     Robert Seidler, Trustee

**For Purposes of Section 9.8:**

_____
Mark Lanterman

[SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF COMPUTER FORENSIC SERVICES, LLC]

Ex. A
29

## EXHIBIT A

### DEFINITIONS

As used in this Agreement and its Exhibits, the following definitions apply:

"**Act**" means the Delaware Limited Liability Company Act, codified in Title 6, Sections 18-101 *et seq*. of the Delaware Code.

"**Additional Member**" means any Member other than a Substitute Member who has acquired a Membership Interest from the Company in accordance with this Agreement.

"**Affiliate**" means:  (i) any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the specified Person; (ii) any Person that is an officer, director, partner, manager, trustee, or employee of, or serves in a similar capacity with respect to, the specified Person (or a Person who meets the tests of clauses (i), (iii) and (iv) of this definition with respect to the specified Person); (iii) any Person that, directly or indirectly, is the beneficial owner of 25% or more of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person is directly or indirectly the owner of 25% or more of any class of equity securities or in which the specified Person has a substantial beneficial interest; or (iv) any spouse of the specified Person.

"**Agreement**" means this Limited Liability Company Agreement as amended, modified or supplemented from time to time in accordance with its terms.

"**Annual Budget**" means the Company's annual budget.

"**Assignee**" means a transferee of Units not admitted as a Substitute Member under **Section 9.6**.

"**Authorized Approval**" means a Member vote, consent or approval that is (i) mandated or permitted by this Agreement; or (ii) mandated by provisions of Law that cannot be waived or modified by contract.

"**Bankruptcy**" means, with respect to any Person, that (a) the Person (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Person a reorganization, arrangement, composition, readjustment, liquidation, winding up, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Person's, or of all or any substantial part of the Person's, properties; or (b) a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, winding up, dissolution, or similar relief under any law has been commenced against the Person and 120 days have expired without dismissal or with respect to which, without the Person's consent or acquiescence, a trustee, receiver, or liquidator of the Person or of all or any substantial part of the Person's properties has been appointed and 120

Exhibit A-1

days have expired without the appointment having been vacated or stayed, or one 120 days have expired after the expiration of a stay, if the appointment has not been vacated.

"**Beginning Capital**" means capital contributed by or credited to the Capital Account of each Member on the Effective Date, the amount or agreed fair value of which is stated on **Exhibit B**.

"**Board**" means the Company's Board of Managers.

"**Business**" means the Company's business as conducted from time to time.

"**Capital Account**" means with respect to each Member, the capital account established and maintained for the Member in accordance with **Exhibit D**.  On the Effective Date, the Members' Capital Accounts are as stated on **Exhibit B**.

"**Capital Contribution**" means any contribution of money or Property to the Company by or on behalf of a Member or Assignee.

"**Certificate of Formation**" means the Company's Certificate of Formation, as adopted and amended from time to time by the Board and filed with the Delaware Secretary of State.

"**CFS**" is defined in the preamble to this Agreement.

"**CFS Managers**" is defined in **Section 4.2.1**.

"**Change Event**" means (i) the liquidation of the Company, or (ii) the acquisition of the Company by a third party that is not an Affiliate of a Member by merger, purchase of all or substantially all of the Company's assets or Membership Interests, or other means where Members immediately before the transaction own, in the aggregate, less than 50% of Membership Interests or other equity interests in the Company after the transaction.

 "**Claims**" means losses, claims, costs, damages, liabilities, expenses (including reasonable legal fees and expenses), judgments, fines, settlements, diminution in value and other amounts arising from or incurred or imposed upon an Indemnified Person in connection with any and all claims, demands, actions, suits or other proceedings, whether civil, criminal, administrative or investigative.

"**Class Percentage Interest**" means the percentage ownership of Units of a particular class of Units held by a Member.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Unit**" means one common unit of Membership Interest in the Company, representing the right to receive Distributions in accordance with **Section 7** and having the other rights, restrictions and obligations in this Agreement or applicable under the Act with respect to Common Units.

"**Common Unit Holders**" means CFS or any succeeding holder of Common Units.

"**Company**" is defined in the preamble to this Agreement.

"**Confidential Information**" is defined in **Section 14.7.1**.

"**Contribution Agreement**" means the Contribution Agreement, dated the Effective Date between CFS and the Company.

"**Control**" and its variants mean, when used with respect to any Person, the power to direct the management and policies of the Person, directly or indirectly, whether through the ownership of voting securities, by contract, as trustee or executor, or otherwise.

"**Covered Parties**" is defined in **Section 14.7.1**.

"**Credit Documents**" means any agreements or other instruments (including security agreements and documents) related to Indebtedness.

"**Discretionary Distributions**" is defined in **Section 7.2.1**.

"**Dissolution Event**" means the death, retirement, resignation, expulsion, removal, Bankruptcy or dissolution of a Person, or, as to a Member, any other event that terminates the continued membership of the Member.

"**Distribution**" means any distribution of cash or assets (including Tax Distributions) made by the Company to a Member or Assignee under this Agreement.

"**EBITDA**" means on a consolidated basis with respect to any 12-month period, the sum of (i) Net Income for that period, plus (ii) interest expense for that period, minus (iii) interest income for that period, plus (iv) the aggregate federal, state, and franchise taxes on or measured by income for that period (whether or not payable during that period), minus (v) the aggregate federal, state and franchise credits against taxes on or measured by income for that period (whether or not usable during that period), plus (vi) depreciation and amortization expense for that period, plus/minus (vii) any loss/gain on sale of assets other than in the Ordinary Course for that period, plus/minus (viii) any foreign exchange loss/gain for that period, in each case as determined on a consistent basis and, in the case of items (ii), (iii), (iv), (v), (vi), (vii) and (viii), only to the extent reflected in determining Net Income for that period.

"**Effective Date**" is defined in the opening paragraph of this Agreement.

"**Effective Tax Rate**" means 45%.

"**Family Member**" means, with respect to any individual, the individual's spouse, parents, brothers, sisters, children (natural or adopted), stepchildren, and other descendants of the individual or the individual's spouse.

"**Family Trust**" is defined within the definition of Permitted Stock Transferee.

"**Financial Information**" includes the Company's balance sheet, income statement and cash flow statement, each compared to prior year comparable periods and the current year budget.

Exhibit A-3

Ex. A
32

"**G&S Members**" is defined in the first paragraph of this Agreement.

"**Gross Asset Value**" is defined in Article 2 of **Exhibit D**.

"**Incapacitated**" or "**Incapacity**" means, as to an individual, any mental or physical illness or disability that renders the individual incapable of performing his duties or functioning in his normal way for more 120 days in any one-year period.

"**Indebtedness**" means all obligations and liabilities of the Company (i) for borrowed money, whether current or funded, secured or unsecured, and all obligations evidenced by bonds, debentures, notes or similar instruments, (ii) under conditional sale or other title retention agreements relating to property or assets purchased by the Company, (iii) issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the Ordinary Course), (iv) under guarantees of the obligations of others, (v) under capital leases or similar arrangements, or (vi) as an account party in respect of letters of credit, banker's acceptances or similar credit transactions.

"**Indemnified Person**" means any current or former Member or Manager, and any current or former officer, director, manager, partner, member, employee or shareholder of any Member or Manager, or any of their respective successors and assigns, heirs, executors or administrators.

"**Initiating Member**" is defined in **Section 10.1.1**.

"**IP Assignment**" is defined in the Unit Purchase Agreement.

"**Law**" means (i) any federal, state, local, or foreign law, statute, regulation, rule, ordinance, code or other provision of law or other governmental requirement; and/or (ii) any order, judgment, decree or other direction of a court, arbitrator, arbitration panel or other tribunal.

"**Major Default Event**" means the occurrence of any of the following: (i) a default under any of the Company's current or future Credit Documents that remains in default after the expiration of any cure periods described in the Credit Documents; (ii) a Bankruptcy occurs with respect to the Company; (iii) Mark Lanterman ceases to be the Company's Chief Technology Officer; (iii) the Company's trailing 12-month EBITDA (measured quarterly) is less than $300,000; or (iv) a breach by CFS or the Company of their obligations to honor any of the rights granted to the G&S Members in the Transaction Documents, including the rights granted to the G&S Members in **Sections 4.3.2** and **10.1**.

"**Manager**" means a member of the Board.

"**Member**" means any initial Member, Substitute Member or Additional Member, so long as those Persons have not ceased to be Members under this Agreement.

"**Membership Interest**" means the rights of a Member or, in the case of an Assignee, the assigning Member's rights, in Distributions (liquidating or otherwise) and allocations of the Company's profits, losses, gains, deductions and credits, and any other rights and benefits to which a Member is entitled under this Agreement and the Act, with the Member's obligations to comply with this Agreement and the Act.

"**Negotiation Notice**" is defined in **Section** Error! Reference source not found..

"**Negotiation Period**" is defined in **Section** Error! Reference source not found..

"**Net Income**" means, with respect to any fiscal period, the net income for that period, determined on a consistent basis.

"**Net Profits**" and "**Net Losses**" are defined in Article 2 of **Exhibit D**.

"**Ordinary Course**" means the ordinary course of business of the Company, consistent with past practices.

"**Overall Percentage Interest**" means a Member's percentage ownership of all Units.

"**Party**" means any party to this Agreement.

"**Permitted Indebtedness**" is defined in **Section 4.3.2(f)**.

"**Permitted Stock Transferee**" means (i) a trust, partnership or other entity  that is (a) primarily for estate planning or similar family purposes, (b) solely for the benefit of Mark Lanterman, his spouse, or one or more of his lineal descendants, (c) Controlled by a Mark Lanterman (until his death or Incapacity), and (d) bound by the Transfer restrictions in **Section 9.8** (an entity meeting all these requirements is a "**Family Trust**"), or (ii) CFS; *provided, however*, that no Transfer, or series of Transfers, of all or any portion of, or any equity interests in CFS results in Mark Lanterman or a Family Trust owning less than 75% of the outstanding CFS equity interests held by Mark Lanterman on the Effective Date, as stated in the Disclosure Schedule to the Unit Purchase Agreement.

"**Permitted Transfer**" is defined in **Section 9.2**.

"**Permitted Unit Transferee**" means (i) any third-party purchaser in an acquisition Change Event approved by the Board; (ii) with respect to a Trust, (a) any beneficiary of the Trust, subject to **Sections 9.5** and **9.6**, (b) the Company in a redemption under **Section 10.1**, or (c) any other transferee approved by the Board (including the Trust Manager); (iii) with respect to CFS, (a) Mark Lanterman, or (c), subject to **Sections 9.5** and **9.6**, a Family Trust.

"**Person**" means any individual or entity permitted to be a member of a limited liability company under the Act.

"**Preferred Preference**" is defined in **Section 2.3**.

"**Preferred Unit**" means one preferred unit of Membership Interest in the Company, representing the right to receive Distributions under **Section 7** and having the other rights, restrictions and obligations in this Agreement or applicable under the Act with respect to Preferred Units.

"**Preferred Unit Holders**" means the G&S Members and/or one or more succeeding holders of Preferred Units.

"**Property**" means any property, real or personal, tangible or intangible, including any legal or equitable interest in that property, but excluding money, services or promises to perform future services.

"**Receiving Party**" is defined in **Section** Error! Reference source not found..

"**Related Person**" means with respect to a specified individual (i) any Family Member of the individual; (ii) any Person that is an Affiliate of the individual; and (iii) any Person with respect to which he or she or one or more of his or her Family Members serves as a director, officer, general partner, member, adviser, executor or trustee (or in a similar capacity).  With respect to a specified Person other than an individual, "Related Person" means (a) any Affiliate of the specified Person; (b) each Person that serves as a director, officer, general partner, manager, executor or trustee of the specified Person (or in a similar capacity); and (c) any Person with respect to which the specified Person serves as a general partner, manager or trustee (or in a similar capacity).

"**Restrictive Covenant Agreement**" is defined in the Unit Purchase Agreement.

"**Stated Amount**" is defined in **Section 2.1**.

"**Substitute Member**" means a transferee of Units admitted to all of the rights of membership under **Section 9.6**.

"**Tax Distribution**" is defined in **Section 7.3.1**.

"**Tax Liability Amount**" is defined in **Section 7.3.1**.

"**Tax Matters Member**" means CFS.

"**Taxing Jurisdiction**" means any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's share of the income or gain attributable to the Company.

"**Transaction Documents**" means this Agreement, the Company's Certificate of Formation, the Unit Purchase Agreement and the Restrictive Covenant Agreements.

"**Transfer**" and its variants mean any direct or indirect, voluntary or involuntary, sale, hypothecation, pledge, assignment, conveyance, gift, attachment, or other transfer.

"**Transferring Member**" is defined in **Section 9.2**.

"**Trust Manager**" is defined in **Section 4.2.1**.

"**Unit**" means the unit of measurement for the allocation of Membership Interests and voting rights of any Member.  Units are classified as Common Units and Preferred Units.

"**Unit Purchase Agreement**" means Unit Purchase Agreement dated the Effective Date among the Company, CFS and the G&S Members.

## <u>EXHIBIT B</u>

## MEMBERS BEGINNING CAPITAL, CAPITAL ACCOUNTS, UNITS AND PERCENTAGE INTERESTS
## AS OF MAY 4, 2017

| Name and Address of Member | Beginning Capital and Capital Accounts in respect of: | Number of Units | Overall Percentage Interest | Class Percentage Interest |
|---|---|---|---|---|
| Computer Forensic, Inc.<br>Attention:  Mark Lanterman<br>601 Carlson Parkway, Suite 1250,<br>Minnetonka, MN  55305<br>E-mail: mlanterman@compforensics.com | Common Units:<br>$11,333,333.33 | Common:<br>8500 | 85% | 100% |
| Carl Lennart Golbranson<br>829 Madre Street<br>Pasadena, CA 91107<br>E-mail: lg@ospllc.com | Preferred Units:<br>$500,000 | Preferred:<br>375 | 3.75% | 25% |
| Carol Golbranson Revocable Trust Dtd 10/19/98<br>515 South Figueroa Street, Suite 1988<br>Los Angeles, CA 90071<br>Attention:  Carol Golbranson, Trustee<br>E-mail: cgolbranson@sbcglobal.net | Preferred Units<br>$500,000 | Preferred:<br>375 | 3.75% | 25% |
| The Robert Seidler Revocable Trust dated October 21, 1999<br>4640 Admiralty Way, Suite 1200<br>Marina del Rey, CA 90292<br>Attention:  Robert Seidler, Trustee<br>E-mail: rseidler@sepfunds.com | Preferred Units:<br>$1,000,000 | Preferred:<br>750 | 7.5% | 50% |
| **TOTAL** | $13,333,333.33 | 10,000 | 100.00% | |

<u>Notice Address for the Company</u>:  Same as for CFS.

Exhibit B-1

Ex. A
36

## EXHIBIT C

### INITIAL OFFICERS

#### Company Officers

Mark Lanterman                    Chief Technology Officer

Exhibit C-1

Ex. A
37

# EXHIBIT D

## ARTICLE 1.

## ALLOCATION OF NET PROFITS, NET LOSSES AND OTHER ITEMS AMONG THE MEMBERS

**1.1** **Capital Accounts**.

(a)     A separate capital account will be maintained for each Member (a "**Capital Account**").  That Member's Capital Account will from time to time be (i) increased by (A) the amount of money and the Gross Asset Value of any Property contributed (or deemed contributed) by the Member to the Company (net of liabilities secured by the Property or to which the Property is subject), and (B) the Net Profits and any other items of income and gain specially allocated to the Member under Paragraph 1.4 of this Exhibit D, and (ii) decreased by (A) the amount of money and the Gross Asset Value of any Property distributed to the Member by the Company (net of liabilities secured by the Property or to which the Property is subject), and (B) the Net Losses and any other items of deduction and loss specially allocated to the Member under Paragraph 1.4 of this Exhibit D.

(b)     If Company assets other than money are distributed to a Member in liquidation, or if the assets are distributed to a Member in kind, in order to reflect unrealized gain or loss, the Members' Capital Accounts will be adjusted for the hypothetical "book" gain or loss that the Company would have realized if the distributed assets had been sold for their Gross Asset Values in a cash sale.  In the event of the liquidation of a Member's interest in the Company, in order to reflect unrealized gain or loss, the Member's Capital Accounts will be adjusted for the hypothetical "book" gain or loss that would have been realized by the Company if all Company assets had been sold for their Gross Asset Values in a cash sale.

**1.2**     **Allocation of Net Profits and Net Losses**.  After giving effect to the special allocations set forth in Paragraph 1.4 of this Exhibit D, the Net Profits or Net Losses of the Company for each fiscal year will be allocated among the Members as follows:

(a)     Net Losses will be allocated (i) first, to the Members, in proportion to their Overall Percentage Interests, until the Adjusted Capital Account balance of any holder of Preferred Units equals the Preferred Preference attributable to the Preferred Units owned by the holder, (ii) second, to the holders of Common Units on a pro rata basis (in proportion to their respective Class Percentage Interests) until their Adjusted Capital Account balances are reduced to zero, (iii) third, to the holders of Preferred Units on a pro rata basis (in proportion to the balances of their respective Adjusted Capital Accounts) until their Adjusted Capital Accounts are reduced to zero, and (iv) finally, to the Members, in proportion to their Overall Percentage Interests.

(b)     Net Income will be allocated (i) first, to reverse prior allocations of Net Losses pursuant to Paragraph 1.2(a)(iv) of this Exhibit D, (ii) second, to the holders of Preferred Units on a pro rata basis (in proportion to their respective Class Percentage Interests), in an amount necessary to cause their respective Adjusted Capital Accounts to equal the Preferred Preference

Ex. A
38

attributable to the Preferred Units owned by such holders, (iii) third, to the Members in an amount necessary to cause their respective Adjusted Capital Accounts to be in the ratio of their Overall Percentage Interests, and (iv) finally, to the Members in proportion to their Overall Percentage Interests.

**1.3**     **Reserved**.

**1.4**     **Special Allocations**.  The following special allocations will be made in the following order:

(a)     Regulatory Allocations.  Allocations of individual items of income and gain will be made in accordance with the "minimum gain chargeback," "partner nonrecourse debt minimum gain chargeback" and "qualified income offset" provisions of the Treasury Regulations promulgated under Section 704 of the Code.

(b)     Nonrecourse Deductions.  Any Nonrecourse Deductions will be allocated to the Members in accordance with their Overall Percentage Interests.

(c)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions will be allocated to the Member that bears the Economic Risk of Loss for the member nonrecourse debt to which such deductions relate as provided in Treasury Regulation Section 1.704-2(i)(1).

(d)     Gross Income Allocation.  In the event that any Member has a deficit in its Adjusted Capital Account at the end of any fiscal year, that Member will be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, *provided* that an allocation pursuant to this Paragraph 1.4(d) will be made only if and to the extent that such Member would have a deficit in its Adjusted Capital Account in excess of such sum after all other allocations provided for in this Article 1 have been made.

(e)     Code Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(f)     Economic Effect.  Notwithstanding any other provision of this Agreement, no allocation of Net Profit or Net Loss or item of profit or loss will be made to a Member if the allocation would not have "economic effect" under Treasury Regulations Section 1.704-1(b)(2)(ii) or otherwise would not be in accordance with the Member's interest in the Company within the meaning of Treasury Regulations Section 1.704-1(b)(3) or Section 1.704-1(b)(4)(iv). The Board will have the authority to reallocate any item in accordance with this Paragraph 1.4(f) of this Exhibit D.

(g)     Curative Allocations.  The allocations set forth in Paragraphs (a) through (f) of this Paragraph 1.4 of this Exhibit D (the "**Regulatory Allocations**") are intended to comply with

certain requirements of Treasury Regulations Section 1.704-1(b) and 1.704-2.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Paragraph 1.4(g) of this Exhibit D.  Therefore, notwithstanding any other provision of this Exhibit D (other than the Regulatory Allocations), the Board will make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Paragraph 1.2 of this Exhibit D.

      **1.5**      <u>**Allocation of Certain Tax Items**</u>.

      (a)      Except as otherwise provided in this Paragraph 1.5, all items of income, gain, loss or deduction for federal, state and local income tax purposes will be allocated in the same manner as the corresponding "book" items are allocated under Paragraphs 1.2 or 1.4 of this Exhibit D.

      (b)      In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any Property contributed to the capital of the Company will, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such Property to the Company for federal income tax purposes and the initial Gross Asset Value thereof (computed in accordance with subparagraph (i) of the definition of the term Gross Asset Value herein), utilizing any permissible method selected by the Board.

      (c)      In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iv) of the definition of the term Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder, utilizing any permissible method selected by the Board.

      (d)      Allocations of income, gain, loss or deduction to affected Members for federal, state and local tax purposes will take into account the effect of such election pursuant to applicable Code provisions.

      (e)      Any elections or other decisions relating to such allocations will be made by the Board in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Paragraph 1.5 are solely for federal, state and local tax purposes and will comprise the information furnished to such Members in their Schedule K-1s each year. Except to the extent allocations under this Paragraph 1.5 are reflected in the allocations of the corresponding "book" items pursuant to Paragraphs 1.2 or 1.4 of this Exhibit D, allocations under this Paragraph 1.5 will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or distributions pursuant to any provision of this Agreement.

**1.6**    **Allocation Between Assignor and Assignee**.  The portion of the income, gain, losses, credits, and deductions of the Company for any fiscal year during which a Membership Interest is assigned by a Member (or by an assignee or successor in interest to a Member), that is allocable with respect to such Membership Interest will be apportioned between the assignor and the assignee of the Membership Interest on whatever reasonable, consistently applied basis is selected by the Tax Matters Member and permitted by the applicable Treasury Regulations under Section 706 of the Code.

**1.7**    **Tax Reporting**.  The Members are aware of the income tax consequences of the allocations made by this Article 1 and hereby agree to be bound by this Article 1 in reporting their shares of Company income and loss for income tax purposes.

**1.8**    **Profit Shares**.  Solely for purposes of determining a Member's proportionate share of the Company's "excess nonrecourse liabilities," as defined in Treasury Regulation Section 1.752-3(a), the Members' interests in Company profits will be deemed to be in accordance with their Overall Percentage Interests.

**1.9**    **Compliance with Treasury Regulations**.  If the Board determines that the manner in which the Members' Capital Accounts are maintained should be modified, or that any particular item of income, gain, loss, deduction or credit should be allocated in a manner other than as provided above, in order to comply with the Treasury Regulations, the Board may instruct the Tax Matters Member to make the modification or the allocation without the consent of any of the Members.

**1.10**    **Safe Harbor Election With Respect to Profit Interests**.  The Company, through the Board, is authorized and directed to elect any "safe harbor" provided by Section 1.83-3(e) of the proposed Regulations and IRS notices and revenue procedures issued in connection therewith (including, but not limited to, Notice 2005-43, Revenue Procedures 93-27 and Revenue Procedure 2001-43)  if, as and when such proposed Regulations may become finally effective, pursuant to which the fair market value of a partnership interest in the Company that is transferred in connection with the performance of services will be treated as being equal to the "liquidation value" of that interest.  The Company and each of its Members (including any Person to whom a Membership Interest is Transferred in connection with the performance of services) agrees to comply with all requirements of any such safe harbor as described in the proposed Regulations, Notice 2005-43 and Revenue Procedures with respect to all Membership Interests transferred in connection with performance of services while the election made by the Company remains in effect.  If a Member Transfers a Membership Interest to another Person, the Person to whom the interest is Transferred must agree, in writing, to assume the transferring Member's obligations under this Section.

# ARTICLE 2.

## DEFINITIONS

As used in this Exhibit D, the following terms will have the following meanings:

"**Adjusted Capital Account**" means, the balance in a Member's Capital Account after giving effect to the following adjustments:

> (i)     debit or credit to such Capital Account, as applicable, all capital contributions and distributions to the Member for the relevant fiscal year;

> (ii)    credit to such Capital Account any amount which such Member is deemed obligated to restore pursuant to Treasury Regulation Section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of Treasury Regulation Sections 1.704-2(g)(1) or 1.704-2(i)(5); and

> (iii)   debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of the term Adjusted Capital Account is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**Adjusted Capital Account Deficit**" means, with respect to a Member, the deficit balance, if any, in such Member's Adjusted Capital Account.

"**Corrective Allocation**" means an allocation (consisting of a pro rata portion of each item) for tax purposes of gross income and gain, or gross loss and deduction, that differs from the Company's allocation of the corresponding items to the Members' Capital Accounts.

"**Depreciation**" means, for each fiscal year or other period, except as required by Treasury Regulation Section 1.704-3(d)(2), an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Gross Asset Value of any asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation will be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis, *provided, however*, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation will be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Tax Matters Member.

"**Economic Risk of Loss**" will have the meaning provided by Sections 1.704-2(b)(4) and 1.752-2 of the Treasury Regulations.

Ex. A
42

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)      the initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset, as determined by the contributing Member and the Board; and

(ii)     the Gross Asset Value of all Company assets will be adjusted to equal their respective gross fair market values (taking Section 7701(g) of the Code into account), as of the following times:  (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* capital contribution; (b) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company; or (c) the issuance of an interest in the Company in consideration for the provision of services to the Company;, *provided*, that in the case of either (a), (b), or (c)  such adjustment will occur only if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company consistent with the requirements of Section 1.704-1(b)(2) of the Treasury Regulations and *provided further*, that in the case of (e) the liquidation of a Member's interest in the Company or of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii)    the Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value (taking Section 7701(g) of the Code into account) of such asset on the date of distribution;

(iv)     the Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 732(d), Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), *provided, however*, that Gross Asset Values will not be adjusted pursuant to this subparagraph (iv) to the extent that the Members determine that an adjustment pursuant to subparagraph (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv); and

(v)      if the Gross Asset Value of any asset has been determined or adjusted pursuant to subparagraphs (i), (ii) or (iv) hereof, such Gross Asset Value will thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing gains or losses from the disposition of such asset.

"**Member Nonrecourse Deductions**" in any year means the Company deductions that are characterized as "partner nonrecourse deductions" under Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"**Net Profits**" and "**Net Losses**" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss, as the case may be for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss and deduction required to be stated separately pursuant to Section 703(a)(1) of the Code will be included in taxable income or loss), with the following adjustments:  (i) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this paragraph will be added to such taxable income or loss; (ii) any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this paragraph will be subtracted from such taxable income or loss; (iii) in the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the definition thereof, the amount of such adjustment will be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses; (iv) gain or loss resulting from the disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; (v) in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there will be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition thereof; and (vi) notwithstanding any other provision of this paragraph, any items which are specially allocated pursuant to Paragraph 1.4 hereof will not be taken into account in computing Net Profits and Net Losses.

"**Nonrecourse Deductions**" in any year means the Company deductions that are characterized as "nonrecourse deductions" under Sections 1.704-2(b)(1) and 1.704-2(c) of the Treasury Regulations.

"**Treasury Regulations**" means, except where the context indicates otherwise, the Department of the Treasury's permanent, temporary or proposed regulations under the Code.

All other capitalized terms used in this Exhibit D will have the same meaning as in the Agreement.

# EXHIBIT B

October 21, 2019

<u>CONFIDENTIAL</u>
<u>VIA FEDEX AND EMAIL</u>

Computer Forensic Services, LLC
Computer Forensic Services, Inc.
Attention: Mark Lanterman
601 Carlson Parkway, Suite 1250
Minnetonka, MN 55305
E-mail: mlanterman@compforensics.com

      Re:    Notice of Major Default Event; Liquidity Notice

Mark:

      We refer to the Amended and Restated Limited Liability Company Agreement (the "**LLC Agreement**") entered into as of May 4, 2017, by Computer Forensic Services, Inc., a Minnesota corporation ("**CFS**"), Carl Lennart Golbranson, an individual ("**CLG**"), the Carol Golbranson Revocable Trust Dtd 10/19/98 (the "**CG Trust**"), and the Robert Seidler Revocable Trust dated October 21, 1999 (the "**RS Trust**" and, with CLG and the CG Trust, the "**G&S Members**"), with respect to Computer Forensic Services, LLC (the "**Company**"). Capitalized terms used in this letter without separate definitions have the meaning given in the LLC Agreement, and all section references in this letter are to that agreement.

      The purpose of this letter is to provide notice that Major Default Events under the LLC Agreement have occurred and are continuing. A Major Default Event means:

      the occurrence of any of the following: (i) a default under any of the Company's current or future Credit Documents that remains in default after the expiration of any cure periods described in the Credit Documents; (ii) a Bankruptcy occurs with respect to the Company; (iii) Mark Lanterman ceases to be the Company's Chief Technology Officer; (iii) the Company's trailing 12-month EBITDA (measured quarterly) is less than $300,000; or (iv) a breach by CFS or the Company of their obligations to honor any of the rights granted to the G&S Members in the Transaction Documents, including the rights granted to the G&S Members in **Sections 4.3.2** and **10.1**.

      Specifically, the Company has breached its obligations referred to in the second clause (iii) and clause (iv) of the foregoing definition, in at least the following respects:

- The Company's trailing 12-month EBITDA (measured quarterly), if properly computed, would be less than the $300,000 for several trailing 12-month periods

since the inception of the Company.

- Section 4.3.2 provides that "the following Company actions require the Trust Manager's prior affirmative vote or prior written consent:
  * * *
  (b)    entering into, or amending, agreements or arrangements with Related Persons of the Company, any Company subsidiary, or any other Company Affiliate;

  * * *

  (k)    entering into new, or amending existing, employment agreements or arrangements with senior Company officers, or increasing the compensation of any Company officer above his/her compensation in effect on the Effective Date (it being understood that Mark Lanterman's annual salary as of the Effective Date is $400,000)."

Each of following matters constitutes a violation of Section 4.3.2:

- The Company's payment of Mark Lanterman's and his family members' (i) personal credit card charges, (ii) car payments, and (iii) other personal expenses and purchases;

- Payment of $300,000 of "board fees" to Mark Lanterman not authorized by the LLC Agreement;

- Purported but undocumented loans from the Company to Mark Lanterman; and

- Purported but undocumented transfers of securities to the Company from accounts controlled by Mark Lanterman.

Also, each of the following constitutes a violation of Section 10.2:

- Failure to provide monthly and annual Financial Information, Annual Budgets, or revisions of Annual Budgets as required by, and within the time periods specified in, Section 10.2.2; and

- Failure to reasonably respond to a Trust's requests to permit its representatives to examine the Company's business, financial and operating records and "make copies of those records for any purpose reasonably related to the Trust's interest in the Company" as required by Section 10.2.1.

In addition, the Company has failed to keep and maintain financial books, records and accounts in accordance with Section 11.2.

Because other Major Default Events may exist and be continuing, the G&S Members reserve the right to declare the existence of additional Major Default Events at any time.

### 10.1    INVESTOR LIQUIDITY RIGHT.

**10.1.1 Redemption Price.** After the earlier of (a) a Major Default Event as defined below; or (b) the 6th anniversary of the closing, either CLG or the RS Trust (in either case, the "**Initiating Member**") may, by notice delivered to the Company (a "**Liquidity Notice**"), require that the Company redeem all of the Preferred Units in cash for the greater of the aggregate Stated Value of the Preferred Units or the fair market value of such units, with no discount for lack of control, lack of marketability or other such considerations ("**FMV**").

This letter constitutes a Liquidity Notice, and the RS Trust is the Initiating Member for purposes of Section 10.1. Pursuant to Section 10.1.2, we invite you to designate a representative prepared to engage with Bob Seidler, as trustee of the RS Trust, in good faith negotiations to determine FMV, as contemplated by Section 10.1.2(a), which reads as follows:

*Negotiation*. During the 15 days following the delivery of the Liquidity Notice (the "**Negotiation Period**"), CFS and the Initiating Member will attempt in good faith to agree on the FMV. If they do so within the Negotiation Period, and (a) the agreed FMV is greater than the aggregate Stated Value of the Preferred Units, the agreed FMV will be the redemption price of the Preferred Units, or (b) the Stated Value is greater than FMV, the Stated Value will be the redemption price of the Preferred Units.

Bob Seidler is prepared to begin those negotiations next Monday, October 21, 2019, or any other day next week you designate.

Failure to reach mutual agreement during the Negotiation Period would require an appraisal pursuant to Section 10.1.2(b), but, under the above formula, the redemption price cannot be less than $2 million in any case.

Please note that the G&S Members' decision not to exercise their other remedial rights under the LLC Agreement during the Negotiation Period is not intended to constitute a waiver of those rights as a result of the foregoing Major Default Events, or as a result of any other breach of the LLC Agreement, breach of fiduciary duty, breach of the Unit Purchase Agreement, or any other default or breach that may exist now or in the future. Please be on notice that the G&S Members reserve their rights to exercise, at any time, and with or without

notice, all of the rights and remedies granted to them under the LLC Agreement and/or the Unit Purchase Agreement. Moreover, any proposals with respect to the redemption price or timing will not be binding on the G&S Members unless and until reduced to writing and formally submitted by the G&S Members in accordance with the notice provisions of Section 14.8.

If you have any questions regarding this Liquidity Notice, please either contact Bob Seidler or ask your attorney to contact our attorney, Todd Green, by telephone (949-288-6565) or email (tgreen@GreenLLP.com).

Sincerely,

**CARL LENNART GOLBRANSON**

**CAROL GOLBRANSON REVOCABLE TRUST DTD 10/19/98**

By: Carol Golbranson, Trustee

**THE ROBERT SEIDLER REVOCABLE TRUST DATED OCTOBER 21, 1999.**

By: Robert Seidler, Trustee